## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIM. NO. MJM-20-72** |
| | * | |
| **KUNLE ALABI,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Currently pending are defendant Kunle Alabi's motions to dismiss the Indictment and to suppress evidence and statements. ECF Nos. 43, 44, 45, & 46. The government filed an omnibus response in opposition to the motions, ECF No. 51, and a supplemental response, ECF No. 55. Alabi filed a reply in support of each motion, ECF Nos. 55, 56, 57, & 58, and a supplemental reply, ECF Nos. 73 & 78. The Court conducted an evidentiary hearing on the motions and heard oral argument on May 19 and 20, 2025. The Court took the matter under advisement and thereafter conducted a pretrial conference on June 2, 2025, during which the parties presented additional evidence based on recent disclosures by the government. For the reasons explained herein, the defendant's Motion to Dismiss Due to Violation of Sixth Amendment's Right to Speedy Trial (ECF No. 45) is granted, and the remaining motions are denied as moot.

### I.    BACKGROUND

#### A.  Wiretap Investigation of James Johnson and Sharafa Buhari in January 2017

In 2016, the Federal Bureau of Investigation ("FBI") began a criminal investigation of drug trafficking in the vicinity of Gilmor Homes in Baltimore, Maryland. James "Farmer" Johnson was the primary target. Investigators believed that Johnson conducted a drug trafficking operation out

of multiple locations in Baltimore, including 1524 North Gilmor Street. The investigative team included FBI Special Agents Mark James and Will Filbert, and Task Force Officers ("TFO") Jeff Lilly and Gerald Hensley.[1] With court authorization, FBI began intercepting wire communications of Johnson's cell phone in or around November 2016. Search warrants eventually executed at various locations associated with Johnson revealed large quantities of heroin and fentanyl, drug trafficking paraphernalia, United States currency, and firearms.

In January 2017, FBI intercepted several calls between Johnson and Sharafa Buhari, a heroin supplier. Johnson and Buhari arranged meetings during these calls. During one such call on January 12, Buhari told Johnson that he was coming alone in a taxi. Gov't Ex. 1. In another call on the same date, Buhari told Johnson he was due to arrive in two minutes. Gov't Ex. 2. Two minutes later, on the same date, footage from a pole camera on the 1500 block of North Gilmor Street captured Buhari arriving in a vehicle and exiting the vehicle carrying a black backpack. Gov't Ex. 3. Johnson encountered Buhari, and the two men entered 1524 North Gilmor Street. *Id.* Less than 15 minutes later, Johnson and Buhari exited the building, entered Johnson's vehicle, and left the area. Gov't Ex. 5. Buhari was not carrying the backpack at this time. *Id.* In less than ten minutes, the vehicle returned and parked, and Johnson and Buhari exited the vehicle and entered 1524 North Gilmor Street. Gov't Ex. 6. Buhari exited the building less than ten minutes later carrying the black backpack, entered a taxi, and departed from the area. Gov't Ex. 7.

Other calls between Johnson and Buhari were intercepted between January 15 and January 20. During one call, Buhari stated that he had returned to Baltimore from New York and arranged to meet Johnson "in about two hours." Gov't Ex. 8. Another call occurred approximately 90 minutes later, during which Buhari told Johnson that he had arrived in a cab, and the two agreed

---

[1] Special Agent James and TFO Lilly testified at the motions hearing.

to have the cab wait for Buhari. Gov't Ex. 9. Shortly after this call, Buhari was captured again on pole camera footage arriving at 1524 North Gilmor Street, carrying the black backpack, encountering Johnson, and entering the building with Johnson. Gov't Ex. 10. Buhari exited the building less than five minutes later, entered the taxi, and left the area. Gov't Ex. 11. During a call on January 17, Buhari told Johnson that he was "coming tomorrow" and that he "ha[d] something for [Johnson,]" and Johnson responded, "Okay." Gov't Ex. 12. During a call on January 19, Buhari and Johnson arranged to meet. Gov't Ex. 13. When Johnson asked where Buhari was going when he "leave[s] from here[,]" Buhari stated that he was "going back to New York" to "meeting those that are coming." *Id.* According to Special Agent James, the intercepted calls and conduct captured in pole camera footage were consistent with illicit drug transactions.[2]

### B.  Seizure of Narcotics from Buhari, Kunle Alabi, and Fatima Fahm on January 21, 2017

During a call intercepted on January 20, 2017, Buhari told Johnson that he was "coming tomorrow[,]" and Johnson agreed that he would see him the next day. Gov't Ex. 14. The investigative team conducted surveillance the following day at a bus stop near a travel plaza in the 5500 block of O'Donnell Street in Baltimore. The investigators believed that Buhari would arrive at this location and planned to seize narcotics from him. Buhari had been previously observed at the same bus stop arriving from New York, and in at least one instance, he appeared to be with at least one other person. The investigative team decided to have TFOs Lilly and Hensley, who were detectives with the Baltimore Police Department ("BPD"), conduct the drug seizure to make the seizure appear random and avoid disclosing the larger federal investigation.

---

[2] By this point, Special Agent James had more than ten years of experience conducting drug trafficking investigations.

The operation was conducted at night on January 21. The investigators observed Buhari exit a bus with two other persons—a woman later identified as Fatima Fahm and a man later identified as Kunle Alabi—and the group started walking through a parking lot toward the nearby travel plaza. Buhari was carrying a brown paper bag, Fahm was carrying a purse and pulling a suitcase, and Alabi was wearing a black backpack with a white Puma emblem. The backpack Alabi was carrying had the same appearance as that Buhari had been captured in pole camera footage carrying in and out of 1524 North Gilmor Street on multiple prior dates.

While seated in an unmarked vehicle, TFO Lilly made eye contact with Buhari, at which point Buhari stopped, put his head down, and briefly communicated with Alabi and Fahm while nodding in the direction of TFO Lilly's vehicle. Buhari then began walking in a different direction, briefly separating from Alabi and Fahm, although Alabi and Fahm soon began to follow him. According to TFO Lilly, Buhari's conduct appeared to be an evasive maneuver intended to avoid law enforcement contact, and he appeared to be leading and attempting to direct Alabi and Fahm.[3]

TFOs Lilly and Hensley stopped the three subjects as they approached the travel plaza. TFO Hensley asked Fahm whether she had anything on her, and she responded by handing her purse to the officer. Looking inside the purse, TFO Hensley found a black plastic bag containing multiple individually wrapped packages of suspected controlled substances, and he relayed this discovery to the investigative team. The TFOs directed the three subjects to sit on the ground and called for additional BPD units. TFO Lilly asked Buhari whether he had drugs on him. Buhari denied having drugs and gave TFO Lilly the brown paper bag he was carrying, which was found to contain food inside.

---

[3] By this point, TFO Lilly had more than ten years of experience as a police officer with BPD, had served as a detective for approximately four years, and had experience conducting drug trafficking investigations.

TFO Lilly then asked Alabi whether he had any drugs on him. Alabi responded, "No," and gave TFO Lilly the black Puma backpack he was carrying. TFO Lilly searched the backpack and found a black plastic bag containing individually wrapped packages of suspected controlled substances and various other items, including two boxes of razor blades, a Bank of America card bearing Buhari's name, and multiple receipts. *See* ECF No. 51-10. Other items were recovered from Alabi's person. Alabi and Fahm each possessed a Nigerian passport in their name.

The TFOs also searched the suitcase Fahm had been pulling and found plastic bags containing individually wrapped pellets of suspected controlled substances. The odor and visual appearance of fecal matter led the investigators to believe that Fahm had ingested wrapped quantities of drugs. The officers asked Fahm whether she had ingested anything and whether she required medical attention, but they had trouble communicating with her due to a language barrier. A medical unit was called for Fahm and transported her to an emergency room. Fahm remained in the hospital for several days and passed additional pellets containing suspected heroin. She was released and later departed from the United States for Nigeria.

Buhari and Alabi were transported to a BPD station the night they were stopped and were released soon thereafter. Special Agent James took custody of the physical evidence, including the packages of suspected narcotics. Chemical testing later confirmed the substances to be heroin. *See* ECF No. 51-5. The heroin was retained in evidence but the black plastic bag found inside the black Puma backpack and the packaging material for the heroin is not presently available.

### C.  Prosecution of Buhari, Johnson, Alabi, and Fahm

After Buhari and Alabi were released, the investigators learned that Buhari was scheduled to depart from the United States on February 2, 2017. On February 1, the government filed a criminal complaint against Buhari and obtained a warrant for his arrest. Agents arrested Buhari at

an airport in New York on February 2. A federal grand jury in the District of Maryland returned an indictment on February 28 charging Buhari with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. *See United States v. Sharafa Buhari*, Crim. No. RDB-17-111. Buhari entered a guilty plea in July 2017 and was sentenced in October 2017. A federal indictment was returned against Johnson in March 2018. *See United States v. James Johnson*, Crim. No. RDB-18-178. Johnson entered a guilty plea in October 2018 and was sentenced in March 2019.

The investigators learned that Alabi was scheduled for a flight to Nigeria after his release from custody but then learned that he was not on this scheduled flight. Based on this booking, Fahm's departure for Nigeria, and Buhari's attempt to depart, the investigators believed that Alabi left the United States without detection. However, between May 2018 and July 2022, Alabi had several contacts with local, state, and federal government agencies in the State of Illinois. He was cited for a traffic violation in DuPage County, Illinois in May 2018, ECF No. 58-1, and he obtained a marriage license in Kane County, Illinois in October 2019, ECF No. 58-3. The State of Illinois issued a driver's permit to Alabi several times between November 2018 and July 2022. ECF No. 58-2. And in March 2021, Alabi submitted an application for adjustment of immigration status to U.S. Citizenship and Immigration Services ("USCIS"). ECF 58-5.

The Indictment in the instant case was filed on February 20, 2020, charging Alabi and Fahm with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. ECF No. 1. The Indictment alleges that between January 19 and January 21, 2017, Alabi and Fahm conspired with one another and other persons to distribute one kilogram or more of heroin. *Id.* The FBI case agents entered the federal warrant for Alabi's arrest in the National Crime Information Center database ("NCIC"). Special Agent James received a new

6

assignment in 2020 and no longer actively worked on drug trafficking investigations. No further steps were taken to apprehend Alabi or determine his location, except that, when FBI's NCIC operator contacted Special Agent James to validate the NCIC entry for the arrest warrant, Special Agent James would correspond with the U.S. Attorney's Office and then validate the warrant as still active. ECF Nos. 58-6, 58-7, 58-12, & 58-13. This validation occurred twice: in June 2021 and September 2022. *Id.* The NCIC entry would ensure that if Alabi had contact with any law enforcement agency and the officers checked Alabi's identifiers in the database, they would become aware of the federal arrest warrant and alert FBI.

In 2021 and 2022, Special Agent James did receive at least two notifications of Alabi's presence in the United States. On August 11, 2021, he was notified that FBI received a message regarding a name-based match on Alabi's full name and that Alabi was fingerprinted for his immigration application to USCIS. ECF No. 58-10. Special Agent James forwarded this notice to Special Agent Filbert on the same date. ECF No. 78-1 at 8. In a separate notice on the same date, Special Agent James was informed that Alabi provided an address in Aurora, Illinois on his immigration application. ECF No. 58-9. In April 2022, Special Agent James received notification from USCIS again that Alabi applied for immigration relief. ECF Nos. 58-11 & 58-15. Special Agent James took no action to locate or arrest Alabi in response to these notices.

On January 24, 2023, officers of Burr Ridge Police Department in Burr Ridge, Illinois stopped Alabi for an alleged traffic violation. ECF No. 51-9. An officer discovered Alabi's federal arrest warrant in NCIC. The United States Marshal Service in the Northern District of Illinois took Alabi into custody on January 25, and Alabi made his initial appearance in that district on January 26. Alabi was ordered released under conditions of supervision.

**D.  Procedural History**

Alabi made his initial appearance in the District of Maryland on February 23, and the Office of the Federal Public Defender was appointed to represent him. Between March 10, 2023, and November 2, 2023, the government filed a series of motions for continuances under the Speedy Trial Act with Alabi's consent. ECF Nos. 12, 14, 16, 18, & 20. In the motion dated August 14, 2023, the government represented that it had completed its discovery obligations but the defense remained in the process of reviewing discovery and additional time was needed to determine whether the matter could be resolved short of trial. ECF No. 18. In the motion dated November 2, 2023, the government confirmed that the parties had begun plea discussions. ECF No. 20. The Court granted each of the consent motions for exclusion of time pursuant to 18 U.S.C. § 3161(h)(7), which tolled the period in which trial must begin under the Speedy Trial Act through February 7, 2024. ECF Nos. 13, 15, 17, 19, & 21.

On January 4, 2024, the Court directed the parties to file a joint status report by February 5, 2024. ECF No. 22. On February 5, the government filed a letter stating that it had fulfilled its discovery obligations and remained in plea discussions with the defense. ECF No. 23. The defense agreed and consented to this status report. *Id.* Thereafter, the government continued filing Speedy Trial Act tolling motions with the defense's consent. ECF Nos. 24 & 27. The Court granted these motions pursuant to 18 U.S.C. § 3161(h)(7), which tolled the period through July 8, 2024. ECF Nos. 26 & 28.

On May 1, 2024, the Court directed the parties to file another status report by July 8, 2024. ECF No. 29. On July 8, the government filed, with the defense's agreement and consent, a letter stating that plea discussions were ongoing and that the defense had informed government counsel that Alabi was "in the process of understanding how resolving the case may impact his immigration

status." ECF No. 31. The government filed another Speedy Trial Act tolling motion with the defense's consent, ECF No. 30, which the Court granted, ECF No. 33, tolling the period through September 7, 2024.

On October 15, 2024, the Court conducted a telephone conference with counsel for both parties for scheduling purposes, during which a potential trial date of May 19, 2025, was identified. The Court directed defense counsel to file correspondence with the Court addressing whether potential trial dates were discussed with Alabi and whether he agreed to the trial date of May 19, 2025. ECF No. 35. No correspondence was filed. But the defense did consent to the government's motion to toll the period through May 19, 2025. ECF No. 36. The Court granted this motion on October 22, 2024. ECF No. 37.

On February 25, 2025, the Court conducted another scheduling call with counsel, during which defense counsel confirmed Alabi's consent to May 19, 2025, as a trial date. *See* ECF No. 39. The Court entered a Letter Order scheduling the matter for a jury trial beginning on June 9, 2025, and setting deadlines for motions and a status report regarding the completion of discovery. *Id.* On March 7, the government filed a status report stating that it had recently produced additional discovery to the defense pertaining to its larger investigation of Johnson and others, wherein mention of Alabi was limited, and requesting modification of certain deadlines and Speedy Trial Act tolling through the new trial date. ECF No. 41. The defense consented and agreed to these requests, and the Court granted them. ECF No. 42.

### E.    Defense Motions

On March 26, 2025, Alabi filed a Motion to Dismiss for Preindictment Delay, ECF No. 43; a Motion to Dismiss Due to Violation of Sixth Amendment's Right to Speedy Trial, ECF No. 45; a Motion to Suppress Statements, ECF No. 44; and a Motion to Suppress Tangible Evidence, ECF

No. 46. The government filed an omnibus response in opposition to all of Alabi's motions on April 14, 2025. ECF No. 51. On April 18, the government filed a sealed supplemental response. ECF No. 55. Alabi filed replies in support of his motions on April 21. ECF Nos. 56, 57, 58, & 59. On May 6, the government disclosed for the first time body-worn camera ("BWC") footage of law enforcement's encounter with Alabi, Buhari, and Fahm on January 21, 2017. On May 14, Alabi filed a supplement noting the recent discovery from the government and advancing additional arguments for dismissal of the Indictment. ECF No. 73.

On May 19, 2025, the Court conducted an evidentiary hearing on Alabi's motions, hearing testimony from Special Agent James and TFO Lilly, and receiving several exhibits into evidence. The Court heard oral argument on the same date and on May 20, took the motions under advisement. On June 2, 2025, the Court conducted a pretrial conference during which the parties presented additional evidence and presented further arguments on the motions that remained under advisement.

For reasons explained below, Alabi's Motion to Dismiss Due to Violation of Sixth Amendment's Right to Speedy Trial (ECF No. 45) is granted, and the Indictment shall be dismissed.

## II.    DISCUSSION

Alabi moves for dismissal of the Indictment on the ground that his Sixth Amendment right to a speedy trial was violated in this case.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "The bounds of this right are 'impossible to determine with precision.'" *United States v. Pair*, 84 F.4th 577, 588 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2589 (2024) (quoting *Barker v. Wingo*, 407 U.S. 514, 521 (1972)). The Supreme Court has described the speedy trial right as "amorphous," "slippery," and

"necessarily relative." *Barker*, 407 U.S. at 522 (citation omitted). The right is "consistent with delays," and whether it is violated is ultimately "depend[ent] upon circumstances." *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quoting *Barker*, 407 U.S. at 522). The Supreme Court has "refused to 'quantif[y]' the right 'into a specified number of days or months' or to hinge the right on a defendant's explicit request for a speedy trial." *Id.* at 89–90 (quoting *Barker*, 407 U.S. at 522–25). Despite its imprecise nature, the consequence for violating a criminal defendant's right to a speedy trial is severe in that it requires the dismissal before the truth of the government's charges can be determined at trial. *Barker*, 407 U.S. at 522; *see also Betterman v. Montana*, 578 U.S. 437, 444–45 (2016) (dismissal of charges as "[t]he sole remedy for a violation of the speedy trial right").

To determine whether a pretrial delay contravenes the speedy trial guarantee, the Supreme Court developed a four-factor balancing test requiring courts to consider: "(1) the length of delay; (2) the reasons therefor; (3) the timeliness and vigor of the assertion of the speedy trial guarantee; and (4) prejudice to the defendant." *United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009) (citing *Barker*, 407 U.S. at 530). To prevail on a speedy trial claim, a defendant must "establish 'that on balance, [the] four separate factors weigh in his favor.'" *Id.* (quoting *United States v. Thomas*, 55 F.3d 144, 148 (4th Cir. 1995)).

### A. Length of Pretrial Delay

The first *Barker* factor calls for consideration of the length of delay between indictment and trial. *Hall*, 551 F.3d 271. The court must determine "whether delay before trial was uncommonly long[.]" *Doggett v. United States*, 505 U.S. 647, 651 (1992) (citing *Barker*, 407 U.S. at 530). This first factor is "actually a double enquiry." *Id.* In addition to serving as one of four factors in the balancing test, an uncommonly long pretrial delay "is a threshold requirement"

necessary to show that "the length of the delay is at least presumptively prejudicial." *United States v. Burgess*, 684 F.3d 445, 451 (4th Cir. 2012) (citing *Doggett*, 505 U.S. at 651–52).

Accordingly, the court must first "decide whether the length of the delay triggers a speedy trial inquiry." *Hall*, 551 F.3d at 271. The length of delay that will trigger inquiry into whether the speedy trial right has been violated is "necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31. For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531. "The Supreme Court has observed that 'postaccusation delay [is] presumptively prejudicial at least as it approaches one year.'" *Burgess*, 684 F.3d at 452 (quoting *Doggett*, 505 U.S. at 652 n.1). But even "a postaccusation delay as short as eight months may qualify as presumptively prejudicial in cases of limited complexity." *Id.* (citing *United States v. Woolfolk*, 399 F.3d 590, 598 (4th Cir. 2005)). In the instant case, approximately five years and three months have passed since the indictment was filed—an uncommonly long delay more than sufficient to trigger a speedy trial analysis.

Next, the court must "weigh 'the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.'" *Hall*, 551 F.3d at 271 (quoting *Doggett*, 505 U.S. at 652). In *Doggett*, the Supreme Court called this factor "significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." 505 U.S. at 652.

It is important to bear in mind that "the constitutional right to a speedy trial is triggered by an indictment[]" and "does not protect a defendant from a pre-indictment delay." *Hall*, 551 F.3d at 271. Some courts have held, however, that once post-indictment delay triggers a speedy trial analysis, "it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government." *United States v. Ingram*, 446 F.3d 1332,

1339 (11th Cir. 2006) (citing *United States v. Vispi*, 545 F.2d 328, 333 (2d Cir. 1976)). This Court agrees. Here, the post-indictment delay in excess of five years stretches far beyond the bare minimum necessary to trigger a speedy trial analysis, especially when considered in combination with the three-year delay in charges before the Indictment was filed.

Accordingly, the Court finds that the first *Barker* factor weighs in favor of finding a violation of Alabi's speedy trial right.

**B. Reason for the Delay**

The second *Barker* factor requires the court to consider the reason for the pretrial delay. *Hall*, 551 F.3d at 271. The court must determine "whether the government or the criminal defendant is more to blame for th[e] delay." *Brillon*, 556 U.S. at 90 (quoting *Doggett*, 505 U.S. at 651). "*Barker* instructs that 'different weights should be assigned to different reasons.'" *Id.* (quoting *Barker*, 407 U.S. at 531). "The reasons for a trial delay should be characterized as either valid, improper, or neutral[,]" focusing on "the intent of the prosecution." *Hall*, 551 F.3d at 272. A reasonably diligent prosecution weighs heavily against finding a speedy trial violation. *See Doggett*, 505 U.S. at 656 ("[I]n this case, if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail."). "Deliberate delay 'to hamper the defense' weighs heavily against the prosecution." *Brillon*, 556 U.S. at 90 (quoting *Barker*, 407 U.S. at 531). Negligence by the government occupies a "middle ground" between diligent prosecution and deliberate delay. *Doggett*, 505 U.S. at 656–57. Official negligence is more neutral than deliberate delay, and it is therefore "weighed more lightly than a deliberate intent to harm the accused's defense[.]" *Id.* at 657. But it "still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Id.*; *see also United States v. Frith*, 181 F.3d 92 (4th Cir. 1999) (unpub.) ("More neutral reasons, such

as governmental negligence or an overcrowded court docket, are still weighed against the government (because it bears the ultimate responsibility for bringing a defendant to trial), but less heavily.").

In *United States v. Loud Hawk*, the Supreme Court recognized the second *Barker* factor, the reason for delay, is "[t]he flag all litigants seek to capture . . . ." 474 U.S. 302, 315–16 (1986). Several courts have taken this statement to place special importance and focus on the second *Barker* factor in the speedy trial analysis. *See, e.g.*, *United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 739 (9th Cir. 1989); *United States v. Seltzer*, 595 F.3d 1170, 1177 (10th Cir. 2010).

Here, the government is to blame for most of the lengthy pre-indictment and post-indictment delays in this case. The Court, again, acknowledges that the Sixth Amendment right to a speedy trial "does not protect a defendant from a pre-indictment delay." *Hall*, 551 F.3d at 271. But when a post-indictment delay is "immediately preceded" by a lengthy lapse in time between "the government's discovery of the alleged offense and its filing of [charges,]" the delay in filing charges is properly considered in conjunction with post-indictment delay as part of the speedy trial analysis. *Vispi*, 545 F.2d at 333; *see also Ingram*, 446 F.3d at 1339. Below the Court will examine the different reasons offered for the period of pre-indictment delay, the period between the filing of the Indictment and Alabi's arrest, and the post-arrest delay.

### 1. Pre-Indictment Delay Between January 2017 and February 2020

The government attributes its three-year delay in seeking an indictment against Alabi primarily to its continuing investigation of Buhari, Johnson, and others. The Court acknowledges that deference must be accorded to decisions made by the government to protect the integrity of its criminal investigations. Still, the passage of time increases the need for sound reasons to justify official delay in bringing an accused to justice, considering the potential prejudice the accused may

suffer from the delay. *Cf. United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 404 (4th Cir. 1985) (quoting *United States v. Lovasco,* 431 U.S. 783, 790 (1977)) (an accused's Fifth Amendment right to due process is violated when prosecution "after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency[]'"); *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990) (finding of unconstitutional preindictment delay where the delay prejudiced the defendant and the state attributed its delay to "mere convenience" and negligence in failing to prosecute the defendant at an earlier point in time); *Vispi*, 545 F.2d at 333 (considering the lengthy four-to-five-year delay in filing charges in deciding whether defendant's speedy trial right was violated, noting that after this delay in filing charges, "further delay in the trial could only serve to increase [defendant's] burden of obtaining witnesses and evidence to show that his conduct had not been willful").

The government's explanation for its three-year delay in charging Alabi is less than satisfactory. Alibi's only connection to the larger Johnson investigation was through his alleged association with Buhari. Buhari's case reached final judgment less than one year after the January 2017 encounter with no apparent harm to the larger investigation of Johnson's drug trafficking operation. Johnson's case reached final judgment in March 2019, almost a year before the Indictment was filed against Alabi in the instant case.

### 2. The Post-Indictment, Pre-Arrest Delay Between February 2020 and January 2023

The Court turns next to consider the reasons for the period of delay between the filing of the Indictment on February 20, 2020, and Alabi's arrest on January 24, 2023. The government offers no valid reasons for this delay of almost three years. Although the FBI case agent took the basic steps of entering Alabi's arrest warrant in NCIC in 2020, after the Indictment was filed, and then confirmed with the U.S. Attorney's Office that the warrant should remain active and validated

the NCIC entry in 2021 and 2022, the government took no active steps to determine Alabi's whereabouts or to effect his arrest. Several courts have found that entering an arrest warrant on NCIC does not suffice to support a finding of reasonable diligence. *See, e.g.*, *United States v. Reynolds*, 231 F. App'x 629, 631 (9th Cir. 2007); *United States v. Boone*, 706 F. Supp. 2d 71, 76 (D.D.C. 2010).

After Alabi's encounter with law enforcement in January 2017, the government believed that he left the United States. For his part, Buhari scheduled a flight to leave the country, but the government charged and apprehended him at the airport before his departure on February 2, 2017. Records government counsel recently acquired from U.S. Customs and Border Protection confirm that, like Buhari, Alabi and Fahm had a booked flight to leave the United States for Nigeria. Fahm, in fact, departed on that flight, but Alabi did not. In these circumstances, the government's suspicion or assumption that Alabi found some other way to leave the country was not unreasonable. But reasonable *diligence* required the government to test this assumption and attempt to determine Alabi's whereabouts, and the government's obligation to test its assumption increased with the passage of time. *See Doggett*, 505 U.S. at 652–53, 656–57.

In *Doggett*, the Supreme Court found negligence by the government when, during a period spanning multiple years, law enforcement "made no serious effort to test their progressively more questionable assumption that [the defendant] was living abroad[.]" 505 U.S. at 652–53. The Court went on to state: "While the Government's lethargy may have reflected no more than Doggett's relative unimportance in the world of drug trafficking, it was still findable negligence, and the finding stands." *Id.* at 653. The Court also stated that "if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail.

16

Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense." *Id.* at 656.

Here, as in *Doggett*, the government "made no serious effort to test" its assumption that Alabi was abroad in the six years that passed between his encounter with TFOs Lilly and Hensley in January 2017 and his eventual arrest by the Burr Ridge Police Department in January 2023. *Id.* at 652–53. But, in this case, the government's failures exceeded the mere negligence or inadvertence presented in *Doggett*.

Special Agent James received notifications originating with USCIS in August 2021 and April 2022 indicating that Alabi applied for immigration relief and provided an address in Illinois. Specifically, Special Agent James received two email notices on August 11, 2021: the first stating that a subject with Alabi's name and matching identifiers applied for an immigration benefit and provided a specific address in Aurora, Illinois; and the second indicating a name-based match for Alabi and advising that the FBI contact USCIS to verify the subject's identity. ECF Nos. 58-8 through 58-11. No action was taken in response to either notification. Next, on April 25, 2022, Special Agent James received a notice from USCIS stating that Alabi applied for immigration relief again that month. ECF No. 58-15.

The notifications in August 2021 and April 2022 clearly undermined the government's assumption that Alabi was out of the country. Still, the agent took no action in response to these notifications.[4] At no point, did he or any other agent assigned to the case check any government

---

[4] The Court acknowledges that Special Agent James was reassigned to another division within FBI by the time he received these notifications and no longer worked drug trafficking investigations. I find little significance in this fact considering that Special Agent James continued consulting the U.S. Attorney's Office about the status of Alabi's arrest warrant and validating the NCIC entry for it after he was reassigned. And at the pretrial conference on June 2, 2025, government counsel confirmed that Special Agent James remains the case agent on this case today.

databases to ascertain whether Alabi was in Illinois, as suggested by the notices from USCIS.[5] "[H]ad they done so, they could have found him within minutes." *Doggett*, 505 U.S. at 653. The investigators would have likely discovered several contacts Alabi had with state and local government agencies in Illinois between the time of his indictment and his eventual arrest almost three years later. In *United States v. Akinsola*, the district court found reasonable diligence lacking where, while the defendant was at large, he "had numerous government contacts," including applying for resident alien cards and driver's licenses in his own name, and "[t]he Government made no attempts to check any of these governmental agencies." 57 F. Supp. 2d 455, 458 (E.D. Mich. 1999). But here, the government's conduct was more culpable than the negligence displayed in *Doggett* and *Akinsola* in that the case agent ignored notices he received from USCIS giving clear indication that Alabi was likely present and available for arrest in Illinois. The government neither proffered nor presented evidence of any good reason to ignore these notices and allow Alabi to remain at large, ignorant of the Indictment accusing him of a serious federal crime and therefore unable to prepare a defense.

Although the Court does not find that the government delayed Alabi's arrest in bad faith or purposefully to impair his defense, the government's conduct is fairly characterized as gross negligence—a level of culpability greater than simple negligence or mere inadvertence. *See United States v. Ferreira*, 665 F.3d 701, 706 (6th Cir. 2011) (government's conduct was "grossly negligent" and "beyond simple negligence" in causing three-year post-indictment delay in securing defendant's transfer from state to federal custody); *United States v. Oliva*, 909 F.3d 1292, 1298–99, 1303–04 (11th Cir. 2018) (finding no clear error in district court's finding that the government

---

[5] Recent communications between Special Agent James and USCIS, which were presented during the pretrial conference on June 2, 2025, demonstrate the ease with which the agent could have followed up with USCIS in response to the notices he received in August 2021 and April 2022.

was "'grossly negligent' in failing to procure [defendants'] arrests," although the government did not "purposefully cause[] delay or otherwise act[] in bad faith").

### 3. Post-Arrest Delay Between January 2023 and June 2025

While the Court finds the government to blame for the six-year delay between its discovery of Alabi's crime and his eventual arrest, the Court cannot place the blame for the delays that followed the arrest solely with the government. Approximately two years and four months have passed since Alabi's arrest, initial appearance, and appointment of counsel. Most of this delay resulted from continuances sought by the government and granted by the Court with Alabi's consent. Although the government continued disclosing discovery to the defense in the weeks and days that preceded and followed the recent motions hearing, the bulk of discovery specifically relevant to Alabi's conduct was disclosed within three months of his initial appearance in this district and appointment of counsel. Thereafter, the defense took time to review the discovery, and the parties engaged in what appears to have been protracted plea discussions that involved the defense assessing what impact a plea agreement might have on Alabi's immigration status. In sum, the post-arrest portion of the pretrial delay in this case was not a bad-faith or deliberate effort to gain tactical advantage over Alabi, and Alabi consented to it. Thus, the Court finds that the reasons for this portion of post-indictment delay are neutral and do not weigh for or against the government.

### 4. Summary of the Reasons for Pretrial Delay

Ultimately, the government's negligence is to blame for most of the five-year-and-three-month post-indictment delay in this case—and for most of the broader eight-and-a-half-year delay that has followed the government's discovery of Alabi's alleged crime in January 2017. The two-year-and-one-month period of delay between the alleged crime and the filing of the Indictment in

February 2020, and the post-indictment delay until August 2021, are owed to simple negligence by the government. But the period of delay between August 2021 and Alabi's arrest in January 2023 is owed to gross negligence by the government. During this period, the government failed to investigate Alabi's location and pursue his arrest even after receiving specific notification that he gave USCIS a specific address for himself in Aurora, Illinois, on an application for immigration relief. The FBI case agent received another notification in April 2022 that Alabi was in the United States and applied for immigration relief again.

To be sure, the Court does not find that the government purposefully delayed Alabi's arrest with "a deliberate intent to harm [his] defense[.]" *Doggett*, 505 U.S. at 657. But a pattern of official negligence emerged and increased in culpability during the six-year period that preceded Alabi's arrest. Accordingly, the second *Barker* factor—"[t]he flag all litigants seek to capture[,]" *Loud Hawk*, 474 U.S. at 315–16—weighs firmly in favor of finding a violation of Alabi's speedy trial right.

### C. Defendant's Assertion of His Speedy Trial Right

The third factor the court must consider is "the timeliness and vigor of the assertion of the speedy trial guarantee." *Pair*, 84 F.4th at 590 (quoting *Hall*, 551 F.3d at 271). "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32. In *Barker*, the Supreme Court rejected "the rule that a defendant who fails to demand a speedy trial forever waives his right." *Id.* at 528. In a typical case, defense counsel is reasonably "willing to tolerate some delay" where counsel "finds it reasonable and helpful in preparing his own case[.]" *Id.* In *Doggett*, the Court recognized that "pretrial delay is often both inevitable and wholly justifiable." 505 U.S. at 656. Thus, "an automatic, pro forma demand made immediately after appointment of counsel[,]"

the Court stated in *Barker*, "is not consistent with the interests of defendants, society, or the Constitution." 407 U.S. at 528. At the same time, however, the Court emphasized that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532.

In *Doggett*, the Supreme Court held that a defendant "is not to be taxed for invoking his speedy trial right only after his arrest" when there is no evidence that the defendant was aware of his charges before his arrest. 505 U.S. at 654. So, in the instant case, the Court cannot weigh the third *Barker* factor against Alabi for failing to assert his speedy trial right before he was arrested. No evidence has been presented to suggest that he was aware of the Indictment before his arrest in January 2023.

However, once Alabi became aware of his charges in January 2023, he bore responsibility for asserting his speedy trial right, and he failed to assert that right for more than two years. Alabi had numerous opportunities to assert his speedy trial right after his initial appearance. Based in part on his consent and the parties' plea discussions, the government filed a series of motions for continuances that spanned two years. Each motion presented an opportunity for Alabi to object to any continuance and either to demand a speedy trial or move for dismissal of the Indictment. Instead, he consented to each continuance. Additionally, before scheduling the trial, the Court requested periodic status reports from the parties and conducted two conference calls with counsel for scheduling purposes. Alabi's speedy trial right was not asserted at any of these points. If Alabi desired a speedy trial, there was no reason for him not to assert his right to one after the government stated on the record in August 2023 that it had completed discovery.[6] Still, the defense continued

---

[6] The government later obtained additional materials to disclose and opted to disclose a broader range of discovery than might have been necessary. But if Alabi desired a speedy trial in this case, the government's first assertion that discovery was complete gave him every reason to demand prompt scheduling of a trial.

consenting to continuances for several more months and eventually consented to a trial date two years and three months after his arrest. He did not assert his right to a speedy trial until he filed his motion to dismiss the Indictment in March 2025—about two and a half months before his trial was scheduled to begin.

The Court finds the two-year delay in Alabi's assertion of his speedy trial right to weigh against a finding that his right was violated in this case. *See United States v. Perry*, 46 F.3d 1128 (4th Cir. 1995) (unpub.) ("With respect to the third factor, whether a defendant has timely asserted his right to a speedy trial 'may be weighed in favor of the Government when the Defendant waits until late in the course of events to assert his right.'") (citation omitted); *United States v. Gould*, 672 F.3d 930, 938 (10th Cir. 2012) ("[I]f the defendant fails to demand a speedy trial, moves for many continuances, or otherwise indicates that he is not pursuing a swift resolution of his case, this factor weighs heavily against the defendant."); *United States v. Brooks*, 734 F. Supp. 3d 447, 466 (D. Md. 2024) (finding defendant's assertion of speedy trial right "woefully deficient" where he "repeatedly joined in the parties' many requests for a continuance").

The Fourth Circuit has found much shorter periods of delay in a defendant's assertion of his speedy trial right to weigh against finding a Sixth Amendment violation. *See Pair*, 84 F.4th at 590 (defendant "did not object to the continuance of his trial" until almost eight months after his indictment and did not oppose "various continuances"); *United States v. Robinson*, 55 F.4th 390, 399–400 (4th Cir. 2022) (defendant did not assert his speedy trial right until more than a year after his arrest); *United States v. Grimmond*, 137 F.3d 823, 829 (4th Cir. 1998) (defendant failed to assert his speedy trial right until four months before the start of his trial); *United States v. Ramey*, 201 F.3d 438 (4th Cir. 1999) (unpub.) (defendant "wait[ed] several months after learning at the indictment to assert his Sixth Amendment right"); *United States v. Bryant*, 417 F. App'x 220, 221–

22 (4th Cir. 2008) (defendant "waited until . . . ten months after his indictment was unsealed," and six months before his trial was scheduled to begin, to assert his right).

Likewise, here, the Court finds that the third *Barker* factor weighs against Alabi. Although vigorous, his motion to dismiss is the first and only time he has asserted his speedy trial right. And this motion was filed more than two years after his arrest, after Alabi consented to several continuances, after his counsel conducted multiple scheduling conferences with the Court, and less than three months before his scheduled trial. This assertion of Alabi's speedy trial right is plainly untimely and weighs against him on the third *Barker* factor.

### D. Prejudice to the Defense

The fourth factor the Court must consider is prejudice to the defendant caused by the pretrial delay. *Hall*, 551 F.3d at 271 (citing *Barker*, 407 U.S. at 530). This factor "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Pair*, 84 F.4th at 590 (quoting *Barker*, 407 U.S. at 532). "The Supreme Court has identified three defense interests for consideration: (1) whether there was an oppressive pretrial incarceration; (2) the anxiety and concern suffered by the accused; and (3) the possibility that the defense was impaired." *Hall*, 551 F.3d at 272 (citing *Barker*, 407 U.S. at 532). Of these interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Although Alabi has not been subjected to "oppressive pretrial incarceration" and has not shown any "anxiety [or] concern" based on the post-indictment delays, he has presented "the possibility that [his] defense [has been] impaired." *Hall*, 551 F.3d at 272.

First, Alabi claims prejudice based on Special Agent James's and TFO Lilly's failure to remember certain details about their investigation when testifying at the motions hearing. Alabi is

correct that, during certain points of each witness's testimony, the witness testified that he could not remember certain details related to the investigation and events of January 2017. In at least one of these instances, TFO Lilly attributed to the passage of time to his difficulty recalling the exact point in time that he recognized the black Puma backpack Alabi was carrying as the same backpack he had previously observed Buhari carrying on pole camera footage. Tr., May 19, 2025, at 105:12–16.[7]

Alabi contends that TFO Lilly's failure in recollection impairs his defense that the search of the backpack he was carrying violated the Fourth Amendment and that the fruits of the search are subject to suppression. The Fourth Amendment "generally requires police to secure a warrant before conducting a search[.]" *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) (quoting *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)) (internal quotation marks omitted). However, the government contends that TFO Lilly's search of the backpack was justified as a search incident to arrest—a well-established exception to the Fourth Amendment's warrant requirement.[8] *See id.* (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)). "[W]hen law enforcement officers have probable cause to make a lawful custodial arrest, they may—incident to that arrest and without a warrant—search the arrestee's person and the area within his immediate

---

[7] To be sure, TFO Lilly's broader testimony about the backpack was notably ambiguous. TFO Lilly testified that he reviewed pole camera footage before stopping Alabi, Buhari, and Fahm on January 21, 2017. Tr., May 19, 2025, at 125:3–5. But when the Court asked him whether he was aware of the black Puma backpack before he stopped Alabi, he responded, "That's a good question, sir," and then stated, while trying to recall, "I was aware but I don't know. I don't know, sir. Like I said, I can't remember exactly when I realized the black Puma bag was in play so I don't want to speculate. I do not – I don't remember." *Id.* at 125:17–126:1. When government counsel later asked TFO Lilly whether "any information" about the backpack was "relayed" to him by other investigators, TFO Lilly stated, "Yes." *Id.* at 126:10–19. When the Court asked when this information was conveyed, the officer stated, "It was prior to the stop," although he could recall the exact point in time. *Id.* The Court finds it likely that the ambiguity in TFO Lilly's testimony is attributable to the passage of eight and a half years in time since the events in question.

[8] The government does not argue that the search of the backpack was justified by Alabi's consent. *See United States v. Buckner*, 473 F.3d 551, 554–55 (4th Cir. 2007) ("[V]alid consent to seize and search items provides an exception to the usual warrant requirement.").

control." *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)) (internal quotation marks omitted). "[I]n determining whether an arrest was justified by probable cause," a court should consider "all the relevant facts known to the arresting officer and 'the inferences [that may be] drawn by [the officer] on the scene,' including the 'officer's practical experience and the inferences the officer may draw from that experience.'" *United States v. Myers*, 986 F.3d 453, 457 (4th Cir. 2021) (quoting *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (alterations in *Myers*)).

The Court finds there to be a real possibility that TFO Lilly's failure in recollection severely impaired Alabi's defense. If TFO Lilly was not aware that the black backpack Alabi was carrying on January 21, 2017, was an apparent match for the one Buhari was captured carrying in earlier pole camera footage, then Alabi could lodge a stronger argument that TFO Lilly lacked probable cause to arrest Alabi at the time he searched the backpack. If TFO Lilly lacked probable cause to arrest Alabi, then his warrantless search of the backpack would not have been a permissible search incident to arrest and would have violated the Fourth Amendment's warrant requirement. The evidence obtained through the search would have been subject to suppression. *See United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) ("The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights[.]'") (quoting *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998)). Suppression of the quantities of heroin found in the backpack would have certainly increased the likelihood of acquittal at trial. Thus, the possibility that stronger recollection by TFO Lilly would have helped Alabi's defense is sufficient to show prejudice associated with the officer's fading memory.

Additionally, Alabi claims prejudice based on the loss of certain physical evidence seized during his encounter with law enforcement on January 21, 2017. Photos of the physical items recovered from the backpack were taken, and the photos remain available. But the black plastic bag in which individually wrapped pellets of heroin were found, the packaging material itself, and other items recovered from the backpack are no longer available for fingerprint or DNA analysis. Special Agent James testified that he would have taken custody of the plastic bag and placed it in FBI's evidence control unit, Tr., May 19, 2025, at 50:19–51:5, but he was not able to remember whether the plastic bag was retained, *id.* at 67:4–9. The Court attributes this lack of recollection to the passage of several years.

Notably, chemical analysis reports issued by the Drug Enforcement Administration ("DEA") for the heroin found in the backpack state that the three exhibits of "[o]riginal packaging" for the substances were "separated and returned to FBI for latent print examination." ECF No. 51-5 at 1–3. Another DEA report includes the remark, "Conduct laboratory analysis [for the suspected heroin] and forward packing to FBI laboratory for fingerprint analysis." *Id.* at 4. According to these DEA reports, the substances were submitted to the DEA lab for chemical analysis on February 22, 2017. *Id.* The Court has been presented with no evidence that the black plastic bag and packaging material were ever submitted for fingerprint analysis. Today, the items are lost and unavailable for any forensic examination. It is not clear from the testimony presented at the motions hearing when and how the physical items were lost. The Court can only attribute the loss of these items, and the lack of information about when or how they were lost, to the passage of time.

Alabi contends that fingerprint and DNA analyses of the lost materials would support his contention that he did not touch and was unaware of the contents of the backpack he was found

carrying. The Court agrees and finds that even negative fingerprint and DNA results from the items would tend to support Alabi's defense. Therefore, the Court finds sufficient prejudice based on Alabi's inability to examine the lost physical items to weigh in his favor on the fourth *Barker* factor.

Finally, Alabi claims that he is prejudiced by the loss of footage from surveillance cameras installed on the scene of his encounter with law enforcement in 2017. At the motions hearing, Angela Valdez, an investigator for the defense, testified that she went to the travel plaza in March 2025 and observed surveillance cameras installed at the location. At least one of the cameras was located in a place where it could have captured Alabi's encounter with law enforcement on January 21, 2017. Valdez spoke with a manager at the facility who told her that the camera was installed and operational in 2017. She testified that the manager told her that footage from the surveillance cameras would have been preserved for a period between 30 and 90 days. The manager himself did not testify or submit an affidavit.

The Court finds Valdez's testimony inadequate to show substantial prejudice based on the loss of surveillance footage. First, Alabi cannot carry his burden with hearsay regarding the operation of the surveillance system in 2017.[9] Second, the Court is left to speculate whether the lost surveillance footage would have aided the defense in any way. Alabi offers no testimony or affidavit as to what the footage would have shown if it remained available.

Still, Alabi has sufficiently demonstrated prejudice based on the loss of recollection by the government's law enforcement witnesses and loss of physical evidence to the passage of time. It is important to note, however, the Supreme Court's holding in *Doggett* that "consideration of

---

[9] The government lodged a hearsay objection to Valdez's testimony about what she learned from the manager at the travel plaza. The Court permitted the testimony to proceed to determine whether there was a non-hearsay source of the investigator's information about the operation of the surveillance system in 2017. There was none.

prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim." 505 U.S. at 655. The Court noted that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id.* (quoting *Barker*, 407 U.S. at 532). Therefore, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay." *Id.* at 655–56 (citing *Loud Hawk*, 474 U.S. at 315). Thus, to the extent that Alabi has failed to demonstrate that lost testimony and lost physical evidence actually impaired his defense, the length of delay in this case—spanning more than five and a half years since the Indictment was filed, and eight and a half years since the government's discovery of the alleged crime—supports a presumption that the delay caused prejudice to the defense.

In sum, the Court finds that the fourth *Barker* factor weighs in favor of finding a speedy trial violation in this case based on the faded recollections of the law enforcement witnesses who testified at the motions hearing and the loss of physical evidence presently unavailable for forensic examination.

### E.  Balancing the Factors

None of the four *Barker* factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533. A court must engage in the "difficult and sensitive" process of balancing the factors and do so "with full

recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Id.*

Here, the first, second, and fourth *Barker* factors weigh in favor of finding a speedy trial violation, but the third factor weighs against such a finding. The Court finds that the combined weight of the first, second, and fourth factors outweighs the third factor. Regarding the third factor, the *Barker* Court did state that a "failure to assert the right [to a speedy trial] will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532. The Court declined to hold, however, "that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances." *Id.* at 536. For instance, "[t]here may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted ex parte." *Id.* Here, not only was the potential prejudice from law enforcement witnesses' lack of recollection severe in that it weakened Alabi's ability to demonstrate a lack of probable cause for the search of the backpack, but the length of delay in this case is longer than that at issue in *Barker*, and most of the delay is not attributable to Alabi's acquiescence. Official negligence accounts for six of the eight and a half years that have passed since the government's discovery of the two-day drug trafficking conspiracy charged in this case. And a substantial portion of the post-indictment delay is owed to FBI's gross negligence in failing to secure Alabi's arrest after receiving multiple notifications that he resided in Illinois.

*Doggett*, again, is instructive. There, the Supreme Court held that the weight accorded official negligence in the speedy trial analysis "compounds over time as the presumption of evidentiary prejudice grows." *Doggett*, 505 U.S. at 657.

> [The Court's] toleration of such negligence varies inversely with its
> protractedness . . . and its consequent threat to the fairness of the

> accused's trial. Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority.

*Id.*

Here, as in *Doggett*, Alabi "would have faced trial 6 years earlier than he did but for the Government's inexcusable oversights." *Id.* While it is true that, unlike Alabi, the defendant in *Doggett* promptly asserted his right to a speedy trial, the government's culpability for the six-year delay at issue in *Doggett* was lower than that in the instant case. In this case, the investigating agency took even fewer steps than those taken in *Doggett* to determine the defendant's location and secure his arrest. *See Doggett*, 505 U.S. at 649 (in addition to placing Doggett's name in NCIC, the case agent notified U.S. Customs stations about Doggett's arrest warrant and, upon discovering that Doggett had been arrested in Panama, unsuccessfully sought cooperation from Panamanian authorities to secure Doggett's return to the U.S.). And as time passed in the instant case and the presumption of evidentiary prejudice increased, the government's culpability for the delay also increased. What may have started as mere inattentiveness by the government became more culpable when, in August 2021, the case agent began receiving notices about Alabi's location and took no responsive action.

The Court notes again that the imprecise nature of the Sixth Amendment right to a speedy trial calls for careful balancing of the factors identified in *Barker* "with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." 407 U.S. at 533. Here, the Court finds that the balance strikes in favor of finding that Alabi's Sixth Amendment right has been violated. Accordingly, the Indictment must be dismissed.

## III.    CONCLUSION

For reasons stated herein, the defendant's Motion to Dismiss Due to Violation of Sixth Amendment's Right to Speedy Trial (ECF No. 45) is granted. The Indictment is dismissed. All remaining motions are denied as moot.

| | |
|---|---|
| _6/6/25_ | _/S/_ |
| Date | Matthew J. Maddox |
| | United States District Judge |